UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARVIN K. LOCKE,<br><br>       Petitioner,<br><br>v.<br><br>DANIEL PARAMO, Warden,<br><br>       Respondent. | Case No.: 17cv0453-JLS(JMA)<br><br>**REPORT & RECOMMENDATION RE: DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |

**I. INTRODUCTION**

Petitioner Marvin K. Locke ("Petitioner"), a state prisoner proceeding pro se, has filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254. Petitioner was convicted by jury in San Diego Superior Court case number SCD160776 for second degree murder, Cal. Penal Code § 187(a), and assault with a firearm, Cal. Penal Code § 245(a)(2). Petitioner contends his conviction for second-degree murder is invalid under Johnson v. United States, 135 S. Ct. 2551 (2015).

The Court has considered the Petition and Memorandum of Points and Authorities in support thereof, Respondent's Answer and Memorandum of Points and Authorities, Petitioner's Traverse, and all the supporting documents submitted by the parties. Based upon the documents and evidence presented in

this case, and for the reasons set forth below, the Court recommends the Petition be **DENIED**.

## II. FACTUAL BACKGROUND

The following statement of facts is taken from the California Court of Appeal opinion, People v. Marvin Locke, No. D042063, slip op. (Cal. Ct. App. April 20, 2004). (Lodgment No. 7.) This Court gives deference to state court findings of fact and presumes them to be correct. Tilcock v. Budge, 538 F.2d 1138, 1141 (9th Cir. 2008). Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. Id.; see also 28 U.S.C. § 2254(e)(1). The facts as found by the state appellate court are as follows:

> A. *The People's Case*
>
> On May 15, 1999, between 7:00 p.m. and 7:30 p.m., Sheila Jones dropped off her 22-year-old son Fred Jones (Fred), the victim, at Seaport Village in San Diego. She testified she had never seen him in possession of a gun or any other weapon, and he was not affiliated with any gangs.
>
> Robin Waters, then age 16, was walking around in the area of Horton Plaza that night. She noticed a group of about 20 people at the corner of Fifth Avenue and Broadway. She knew that some of the people wearing red attire in that group were members of the Bloods gang. Red was the gang color of the Bloods. While attending Point Loma High School, Waters had become acquainted with various individuals who were affiliated with the Bloods and Crips gangs.
>
> Waters noticed an individual was "disrespecting" the congregated group. He seemed to be chanting some kind of battle cry, and he made a "C" gesture with his hand, which Waters knew was a symbol typically thrown up by members of the Crips gang. Crips are rivals of the Bloods. Waters did not see the person who had flashed the "C" symbol in possession of any weapons. The

lighting in the area was good.

Almost immediately after the person made the gesture with his hands, Waters heard gunshots. She was between the shooter and the person the shooter was firing at (the person who had made the gesture). Waters recalled that three or four shots were fired.

Maria Palma, who was waiting for a bus not far away from the shooter and the group, was struck in the buttocks by one of the bullets. She was hospitalized and the bullet was removed.

Police officers who responded to the shooting found Fred sitting on a bus bench in the 700 block of Broadway. At the time he was shot, Fred had not bumped into anybody and had not reached for any weapon. He was transported to the hospital where he was pronounced dead. The cause of death was loss of blood as a result of two gunshot wounds to the back. No alcohol or illicit drugs were found in Fred's blood. No weapons were found on his person.

Locke's father testified he had placed a .38-caliber handgun in his dresser drawer sometime during the early months of 1999. In May or June, he discovered that the handgun was missing. He also discovered that a second (.22-caliber) handgun he owned was also missing. Locke initially denied taking the firearms, but later admitted to his father that he had taken the .38-caliber handgun. Although the handgun that was used to shoot Fred and Palma was never recovered, a criminalist determined that all three bullets fired at the scene were fired from the same .38-caliber handgun.

Detective Joseph Howie of the San Diego Police Department testified that when he interviewed Locke on May 15, 1999 (the day of the shooting), Locke claimed he was a member of the Lincoln Park Bloods gang. Locke denied knowing who the shooter was. Detective Howie also interviewed McKinley, who also admitted he was a

3

member of the Lincoln Park Bloods gang.

In the latter part of May 1999, Locke went to Oklahoma and stayed with his maternal grandmother.

Detective Bruce Pendleton testified as a gang expert. He stated that Locke and McKinley were both Lincoln Park gang members on the day of the shooting. He opined that the killing of Fred was done for the purpose of enhancing the reputation of the Lincoln Park Bloods, and also for the purpose of enhancing Locke's reputation.

*May 22, 2002 Interview and Locke's Waiver of His Miranda Rights*

On May 22, 2002, after they traveled to Oklahoma and transported Locke back to San Diego, Detectives Howie and Robert Donaldson interviewed Locke. The interview (the May 22 interview) was videotaped and the videotape was played to the jury.

Before Locke was questioned about the shooting incident, he was given *Miranda* warnings. Locke stated he understood each of his *Miranda* rights and waived those rights by agreeing to answer the questions. Detective Howie testified that prior to the May 22 interview, he advised Locke that he had been charged with murder.

During the May 22 interview, Locke stated he was a member of the Lincoln Park Bloods at the time of the shooting. Locke admitted he shot Fred. He did so because he saw Fred with a gun. He stated that he fired his gun when Fred turned around. Fred had come through the Bloods group, "cussing" and "disrespecting," and had reached for a gun in his waistband. Locke was accompanied by his fellow gang members McKinley and Andre Luster. Locke admitted that he took his father's .38-caliber handgun. Locke had purchased bullets for the gun.

*May 24, 2002 Interview and Locke's Waiver of His Miranda Rights and His Sixth Amendment Right to Counsel*

Detective Donaldson testified about a second recorded interview of Locke on May 24, 2002 (the May 24 interview). Detective Donaldson was present, but the questioning was conducted by Deputy District Attorney (D.A.) Mark Amador. The videotape of the May 24 interview was played to the jury.

At the beginning of the May 24 interview, Deputy D.A. Amador gave Locke the *Miranda* warnings. Locke stated he understood each of his *Miranda* rights and waived those rights by agreeing to answer the questions.

Immediately thereafter, Deputy D.A. Amador asked Locke, "[Y]ou know that *you've been charged* in this case, that's why they extradited you from Oklahoma, right?" (Italics added.) When Locke replied, "Yes," Deputy D.A. Amador immediately advised him that since he had been charged, under the Sixth Amendment he had the right to an attorney. Deputy D.A. Amador then asked Locke, "Do you waive that right?" Locke replied, "Yeah."

After Waiving his *Miranda* rights and his Sixth Amendment right to counsel, Locke again admitted that he shot Fred. He stated he was the only one in his group with a gun. It was a .38-caliber revolver. He again testified he had seen a gun on Fred. Fred was claiming to be a Crip. Locke stated he remembered firing the gun three times. He believed killing a Crip was a "badge of honor" that would increase his reputation with the Bloods. After the killing, other Bloods gang members began calling Locke "Killer" and giving him more respect. He stated he went to Oklahoma after the killing to avoid being arrested by the police, but he had planned the trip before the killing. When confronted with the fact that Fred had been shot twice in the back, Locke stated that Fred "could have been running away," but Locke did not remember.

B. *The Defense*

Locke testified at trial and recanted much of what he stated during the May 22 and May 24 interviews. He stated that although he "used to be" a Lincoln Park Blood, he was not a Lincoln Park Blood at the time of the shooting and that McKinley was the shooter. He also testified that he moved to Oklahoma a week or two after the shooting not to run away from the police, but because his relatives and fiancé were there. He did not tell the police that McKinley was the shooter because he feared for his father's safety if he did so.

Locke also stated that just before the May 22 interview occurred, Detective Howie told him the shooting of Fred was not a first degree or second degree murder and suggested that some type of manslaughter charge was probably appropriate.

C. *The People's Rebuttal Case*

Sharay Jones testified that Locke called her from Oklahoma about a month after the shooting. Locke told her, "I'm running from the police" and "I did something real bad."

Detective Donaldson testified that he never heard Detective Howie say anything to Locke about what level of homicide charge was appropriate for this case. He never heard Detective Howie imply that the district attorney would be lenient if Locke admitted he was the shooter.

Detective Howie testified that when he interviewed Locke in Oklahoma on February 27, 2001, Locke denied that he was the shooter and also denied that McKinley was the shooter. During that interview, Locke also denied he had a gun on the night of the shooting. Detective Howie denied discussing levels of homicide with Locke and

|   |   |
|---|---|
| 1 | denied telling Locke that he might receive lenient |
| 2 | treatment. |

(Lodgment No. 7 at 2-7.)

### III. PROCEDURAL BACKGROUND

A jury found Petitioner Marvin Locke guilty of second-degree murder, Cal. Penal Code § 187(a), and assault with a firearm, Cal. Penal Code § 245(a)(2). True findings were made by the jury that in the murder, Petitioner personally used a firearm, Cal. Penal Code §§ 12022.5(a)(1) and 12022(b)-(d), and Petitioner committed the offense for the benefit of a street gang, Cal. Penal Code § 186.22(b)(1). In regard to the assault, true findings were made that Petitioner personally used a firearm, Cal. Penal Code § 12022.5(a)(1). The trial court sentenced Petitioner to prison for 41 years to life. (Lodgment No. 7 at 1-2.)

Thereafter, Petitioner initiated a direct appeal of his conviction, challenging statements he made to officers as unconstitutional under Miranda v. Arizona, 384 U.S. 436 (1966). (Lodgment No. 4.) The California Court of Appeal rejected the claim. (Lodgment No. 7.) The California Supreme Court denied Petitioner's petition for review without comment on June 23, 2004. (Lodgment No. 9.)

On June 21, 2016, Petitioner filed a habeas petition in the San Diego County Superior Court, claiming his conviction was invalid because Johnson v. United States, 135 S .Ct. 2551 (2015) applies retroactively to his conviction for second-degree murder. (Lodgment No. 10.) Although this petition was filed more than 13 years after sentencing, the Superior Court found it to be timely to the extent it relied on Johnson, which was not decided until 2015, and denied the claim on the merits. (Lodgment No. 11.) Petitioner then filed a habeas petition in the California Court of Appeal, raising the same claim. (Lodgment No. 12.) The Court of Appeal denied the claim on the merits. (Lodgment No. 13.) Petitioner then filed a habeas petition in the California Supreme Court, raising the same

/ /

claim. (Lodgment No. 14.) The California Supreme Court denied the petition without comment on November 16, 2016. (Lodgment No. 15.)

On February 12, 2017, Petitioner filed his Petition in this Court. Respondent filed an answer on May 8, 2017, and Petitioner filed a traverse on June 16, 2017.

## IV. DISCUSSION

Petitioner raises two claims in this petition. First, Petitioner claims a petition for writ of habeas corpus is an "appropriate vehicle for second or successive petition." (Doc. No. 1 at 6.) Second, Petitioner claims his conviction for second-degree murder is invalid under Johnson. (Id. at 7.)

### A. Standard of Review

Title 28, United States Code, § 2254(a) sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

The current Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320 (1997). As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). The Supreme Court interprets § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2000); see also Lockyer v. Andrade, 538 U.S. 63, 73-74 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. See Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000) (overruled on other grounds by Lockyer, 538 U.S. at 75-76); Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. Early v. Packer, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]," the state court decision will not be "contrary to" clearly established federal law. Id.

**B. Claim 1**

Petitioner first claims, without any explanation as to how this proposition applies to his case, a petition for habeas corpus is an appropriate vehicle for a second or successive petition. (Doc. No. 1 at 6.) This Petition, however, is the first Federal habeas petition Petitioner has filed. Because this is his first federal habeas petition, the issue is moot.[1]

**C. Claim 2**

Petitioner claims next that his conviction for second degree murder is invalid under Johnson. Specifically, Petitioner claims his conviction is invalid because California's "inherently dangerous felony murder rule" is unconstitutionally vague under Johnson and, therefore, the decision of the California Court of Appeal is contrary to clearly established U.S. Supreme Court precedent. (See Doc. No. 12 at 8-10.)

Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); Early v. Packer, 537 U.S. 3, 8 (2003). Petitioner's claim here arises under § 2254(d)(1). Clearly established federal law, for purposes of § 2254(d)(1), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." Andrade, 538 U.S. at 72.

---

[1] Respondent theorizes Petitioner's first claim may be a preemptive argument regarding the timeliness of his Petition. (Doc. No. 5 at 4.) Because 13 years had passed since his sentencing when Petitioner first presented his Johnson-based habeas claim to the state courts, timeliness was an issue there. The Superior Court concluded that as far as his petition concerned the ruling in Johnson, the 13 year delay between sentencing and the filing of his petition was justified, because Johnson was not decided until 2015. (Lodgment No. 11 at 3.) Here, however, no issue has been raised, and there does not appear to be one, with respect to the timeliness of Petitioner's federal habeas Petition.

The Supreme Court precedent on which Petitioner relies is <u>Johnson</u>, which held imposing an increased sentence under the Armed Career Criminal Act's ("ACCA") "residual clause" violated due process. <u>Johnson,</u> 135 S. Ct. at 2554. In <u>Johnson</u>, the petitioner pled guilty to being a felon in possession of a firearm in violation of federal law, namely 18 U.S.C. § 922(g). <u>Id.</u> at 2556. Under the ACCA, a person convicted under § 922(g) could face an enhanced sentence with a minimum of 15 years if that offender had three or more earlier convictions for a "serious drug offense" or a "violent felony." <u>Id.</u> at 2555. In <u>Johnson</u>, the petitioner was given this enhanced minimum sentence under the ACCA based upon prior convictions for "violent felonies." <u>Id.</u> at 2556. The petitioner took issue with whether possession of a short-barreled shotgun qualifed as a violent felony under the ACCA's definition of violent felonies. <u>Id.</u> The specific question before the Supreme Court was whether this offense qualified as a violent felony under the ACCA's definition of violent felony in the statute's residual clause: "(ii) is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another*." <u>Id.</u> at 2555-56 (residual clause italicized). The Court decided the residual clause was unconstitutionally vague for two reasons: (1) the residual clause left grave uncertainty about how to estimate the risk posed by a crime and (2) the residual clause also left uncertainty about how much risk it takes for a crime to qualify as a violent felony. <u>Id.</u> at 2558. Petitioner contends this principle should similarly apply to California's second degree felony murder rule. (<u>See</u> Doc. No. 12 at 9-10.)

Petitioner's claim rests on the assumption he was convicted for second degree murder, specifically under California's second degree felony murder rule. Petitioner claims the language "inherently dangerous to human life" in the second degree felony murder rule is unconstitutionally vague under <u>Johnson</u>. In order for Petitioner to have standing to bring such a claim, however, he would have to

/ /

have been convicted under the second degree felony murder rule, which he was not.

As discussed by the Court of Appeal, Petitioner was convicted for second degree murder, assault with a firearm, plus several enhancements. (Lodgment No. 13.) He personally shot and killed Fred Jones, because, he said, Jones made gang-related comments and gestures and because Petitioner believed Jones was armed. (Lodgment No. 7 at 2-6.) As the California Court of Appeal observed, the record is devoid of any crime that would trigger the felony murder rule. (Lodgment No. 13 at 1.)

There also is no evidence the jury was given any sort of instruction as to a felony murder charge. In both his Petition and his Traverse, Petitioner references an appendix which contains all the jury instructions given to the jury at his trial. (See Doc. No. 1-3; Doc. No. 12.; Cf. Lodgment No. 2 at 77-160.) Nowhere in these jury instructions is there any instruction about the second degree felony murder rule. (See Lodgment No. 2 at 77-160.) There were two instructions given relating directly to second degree murder: CALJIC No. 8.30 and 8.31, with adaptations. (Id. at 114-15.) These instructions read as follows:

> CALJIC 8.30: UNPREMEDITATED MURDER OF THE SECOND DEGREE
>
> Murder of the second degree is also the unlawful killing of a human being with malice aforethought when the perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation.
>
> CALJIC 8.31: SECOND DEGREE MURDER—KILLING RESULTING FROM UNLAWFUL ACT DANGEROUS TO LIFE
>
> Murder of the second degree is also the unlawful killing of a human being when:

> 1. The killing resulted from an intentional act,
>
> 2. The natural consequences of the act are dangerous to human life, and
>
> 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life
>
> When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being.

(Id.) The phrases "inherently dangerous" and "inherently dangerous to human life" appear nowhere in the jury instructions regarding second degree murder. (Id.) In fact, neither of these phrases appears in any of the jury instructions – there simply is no mention of the felony murder rule anywhere in the jury instructions. (See Id. at 77-160.) Neither the facts of his conviction nor the jury instructions at trial indicate Petitioner was convicted under California's second degree felony murder rule. The issue of whether California's second degree felony murder rule is unconstitutional under Johnson is, thus, immaterial to Petitioner's case. Accordingly, this Court recommends Petitioner's claim be denied.

## V. RECOMMENDATION

After a thorough review of the record in this matter, the undersigned magistrate judge finds Petitioner has not shown that he is entitled to federal habeas relief under the applicable legal standards and, accordingly, the undersigned magistrate judge hereby recommends that the Petition be **DENIED WITH PREJUDICE** and that judgment be entered accordingly.

This Report and Recommendation is submitted to the Honorable Janis L. Sammartino, United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). **IT IS ORDERED** that not later than **August**

1 **23, 2017**, any party may file written objections with the Court and serve a copy
2 on all parties. The document should be captioned "Objections to Report and
3 Recommendation**."** **IT IS FURTHER ORDERED** that any reply to the objections
4 shall be served and filed not later than **August 31, 2017**. The parties are
5 advised that failure to file objections within the specified time may waive the right
6 to raise those objections on appeal of the Court's order. See <u>Turner v. Duncan</u>,
7 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir.
8 1991).

    **IT IS SO ORDERED.**

Dated: August 4, 2017

_____
Honorable Jan M. Adler
United States Magistrate Judge